IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 4, 2025

## ERNEST BUTLER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 15-01445      Lee V. Coffee, Judge

_____

## No. W2024-00996-CCA-R3-PC
_____

Petitioner, Ernest Butler, was convicted of first degree felony murder and possession of a firearm by a convicted felon, for which he received an effective sentence of life imprisonment plus fifteen years. This court affirmed Petitioner's convictions and sentences on direct appeal. Petitioner then filed a petition for post-conviction relief in which he claimed ineffective assistance of counsel, and the post-conviction court denied the petition after a hearing. On appeal, Petitioner asserts that trial counsel was ineffective for failing to object to the State's methods for refreshing and impeaching a testifying witness, and for failing to request a jury instruction on voluntary intoxication. He also argues cumulative error deprived him of a fair trial. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Donald S. Hackett, III (at hearing and on appeal), and Carlos Maldonado (at hearing), Memphis, Tennessee, for the appellant, Ernest Butler.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Steve Mulroy, District Attorney General; and Leslie Byrd and Carlos Dwyer, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Facts and Procedural History

A. Trial

In July 2019, Petitioner shot and killed the victim, Kent Smith, in Memphis, Tennessee. *State v. Butler*, No. W2017-00136-CCA-R3-CD, 2018 WL 934584, at *1 (Tenn. Crim. App. Feb. 15, 2018), *perm. app. denied*, (Tenn. June 8, 2018). A Shelby County grand jury indicted Petitioner on first degree felony murder in the perpetration of or the attempt to perpetrate robbery and possession of a firearm by a convicted felon. Petitioner proceeded to trial in October 2016 where the following evidence was presented in relevant part.

During the morning hours of July 19, 2014, Petitioner, along with Autumn Hill, Autry Hampton, and Reginald Mull, left the Getaway Club in Mr. Hampton's car and stopped at Midway Liquors in Memphis. *Id.* at *1. Petitioner's three companions were not aware of Petitioner's "intentions" and "waited" in the car while Petitioner entered the store "where he purchased a pack of cigarettes and became angry at the clerk, Kent Smith, whom he shot and killed." *Id.* The victim returned fire before he died and struck Petitioner with a bullet in the arm. *Id.* The store's surveillance cameras capture the shooting and Petitioner's "taking money from the cash register." *Id.* Petitioner subsequently fled the store. *Id.*

Ms. Hill, Mr. Hampton, and Mr. Mull testified for the State at trial. *Id.* at *1-3. Ms. Hill and Mr. Hampton knew Petitioner by the nickname "Bald Head." [1] Ms. Hill testified that she got out of the car as Petitioner got back into it. *Id.* at *2. She stated that she believed that Petitioner had tried to rob the victim, who had shot him in return. *Id.* She recalled that after temporarily leaving Midway Liquors, she returned and spoke with police to avoid appearing guilty. *Id.* She initially misidentified Petitioner during a photographic lineup after the incident, but at trial acknowledged Petitioner was the person who had run out of the store with a gun and got into Mr. Hampton's car. *Id.*

Mr. Hampton and Mr. Mull both acknowledged that they were charged with accessory after the fact in the same indictment as Petitioner. *Id.* at *2-3. Mr. Hampton testified that Petitioner, who was upset about spending the last of his money on bad cocaine, got into Mr. Hampton's car at the Getaway Club. *Id.* at *3. When the group stopped at Midway Liquors, Petitioner got out of the car, stating that he was "goin' in the store." *Id.* A couple of minutes later, Petitioner returned to the car bleeding and carrying a firearm. *Id.* Mr. Hampton acknowledged that he initially lied to the police that Petitioner had carjacked him, but, after learning that the victim had died, he told the police the truth. *Id.*

---

[1] We take judicial notice of this court's appellate record in *State v. Butler*, No. W2017-00136-CCA-R3-CD. *See* Tenn. R. App. P. 13(c); *e.g., Harris v. State*, 301 S.W.3d 141, 147 n.4 (Tenn. 2010) (noting that an appellate court may take judicial notice of its own records).

- 2 -

Mr. Mull testified that he left the Getaway Club in Mr. Hampton's car around 7:00 a.m. along with Mr. Hampton, Ms. Hill, and Petitioner. Mr. Mull stated that Mr. Hampton was going to drop him off at his home, but first, they stopped at Midway Liquors. Mr. Mull did not recall details of the conversation between Petitioner and Mr. Hampton during this time but remembered Petitioner exiting the car and returning a couple of minutes later. He stated that when Petitioner returned to the car, he had been shot in the arm and was armed with what "looked like a snub-nosed 38 revolver." Once Petitioner got in the car,

> Like what he did, what happened, I was just like the three of us
> all were like he was bleeding and blood was shooting on me,
> so I'm trying to keep the blood from shooting all over me. So
> that's when I gave him my shirt . . . so I covered the wound so
> his blood would not shoot on me anymore.

Mr. Hampton started driving away and Mr. Mull asked Petitioner what he had done, to which Petitioner responded, "The man shot me." Mr. Mull testified that he was concerned that police officers would think that he and Mr. Hampton were involved, so he told Mr. Hampton to drive to his nearby house where they could call the police and an ambulance. Once there, Mr. Mull stated that he threw the firearm into the backyard. Mr. Mull testified that he did not know what had happened in the store but thought that Petitioner had likely done "something that he had no business doing."

Thereafter, Mr. Hampton's girlfriend came to the residence and gave Petitioner a ride and then took Mr. Mull and Mr. Hampton to Mr. Hampton's house. At the house, Mr. Mull claimed that Mr. Hampton asked him to "fabricate the story." Mr. Mull stated that he eventually agreed to this and called the Memphis Police Department ("MPD"). To avoid incriminating themselves, Mr. Mull testified that they told police that Petitioner had got into the car, pulled a gun on them, shot it in the air, and made them drive him to Mr. Mull's residence. However, Mr. Mull acknowledged that this account wasn't true. He testified that he returned to the police station where he gave a signed written statement as to what truly occurred.

During the direct examination of Mr. Mull, the State questioned him about a written statement that he had made to police. The State proceeded to read from the statement, leading to the following exchange:

Q: Now, in the written statement there's a question that's asked to you, on the second page of your statement, "In your own words and in as much detail as possible, describe the events that took place just before,

- 3 -

during and after the incident."  Do you remember being asked that question?

A:    Yes, ma'am.

Q:    Do you remember responding, "we was sittin' in Autry's car and we seen the store owner go into the store.  Bald Head said he was going to go in to see what the store owner had in his bag."  Do you remember telling that to the police?

A:    No, ma'am, I don't recall saying that.  But I know I remember him goin' -- I know I remember seeing Mr. Kent go in the store with a bag in his hand.

Q:    Was there any conversation that you remember about that bag when he went in?

A:    No, ma'am.

Q:    Did Autry say anything that you remember about the bag?

A:    No, ma'am

Q:    Were you paying attention or you don't know or what?

A:    I know -- I know Autry, he didn't say nothin' -- anything about the bag.

Q:    But you told the police Bald Head did then, right?

A:    I can't recall saying that.  I don't remember.

Q:    If it's in your signed statement, you said it, didn't you?

Petitioner's trial counsel ("Counsel") objected to the leading form of the question, but the trial court overruled the objection.  Counsel made no other objection to the State's use of the written statement to question Mr. Mull.  The State again asked Mr. Mull if he remembered making the above statement, to which he responded, "See, I didn't even know his name was Bald Head, so I don't remember making that statement.  But I do remember seeing Mr. Kent going in the store with a bag in his hand."  The State then proceeded to give Mr. Mull his statement and had him read the above statement into the record.

Sergeant Eric Kelly of the MPD testified that he was able to locate Petitioner in a Mississippi hospital, from where he was transported back to Memphis.  Sergeant Kelly further confirmed that he located the firearm Petitioner used in the shooting, based upon information provided by Mr. Hampton and Mr. Mull.

Petitioner testified on his own behalf.  *Butler*, 2018 WL 934584, at \*3.  He acknowledged that he had prior convictions for aggravated burglary, three robberies, bank robbery, attempted aggravated robbery, as well as multiple thefts.  *Id.*  Petitioner testified that the night before the shooting he had snorted cocaine, taken Xanax, and drank alcohol throughout the night until 6:00 or 7:00 a.m.  He stated that the pills made him "feel groggy and agitated and aggressive."

- 4 -

Petitioner explained that early on the morning of July 19, he "was angry because he had been sold some bad cocaine" a few hours earlier. *Id.* Petitioner claimed that while sitting in the car outside of Midway Liquors, he told Mr. Hampton that he wanted to get his money back for the bad drugs. He then proceeded into the store to purchase cigarettes.

Petitioner testified that while inside the store, he placed money on the counter for a pack of cigarettes and that the victim "threw [the cigarettes] on the counter." *Id.* Petitioner stated that this further angered him, prompting him to ask the victim, "what the f***? Why did you throw the cigarettes on the counter?" Angered by the victim's action and his refusal to return Petitioner's money, Petitioner shot the victim, who fired in return, striking him in the arm. *Id.* Petitioner returned to the car where he told the occupants that he "F'd up."

A Shelby County jury found Petitioner guilty on all counts. *Id.* On direct appeal, Petitioner argued that the evidence presented at trial was legally insufficient to sustain his conviction for first degree felony murder. *Id.* at *3-4. Concluding that "[t]he evidence against [Petitioner] was overwhelming," this court affirmed the judgments of the trial court. *Id.* at *4. Petitioner sought permission to appeal to the Tennessee Supreme Court, which was denied June 8, 2018.

Thereafter, Petitioner filed a timely pro se petition for post-conviction relief, alleging ineffective assistance of counsel. He asserted that Counsel failed to properly object to the State's use of Mr. Mull's written statement, that Counsel failed to assert the defense of voluntary intoxication, and that the cumulative effect of these errors deprived Petitioner of a fair trial. The post-conviction court appointed counsel to represent Petitioner. On August 2, 2023, the post-conviction court conducted a hearing on Petitioner's claims.

## B. Post-Conviction Hearing

At the post-conviction hearing, Petitioner called Counsel as his first witness. Counsel testified that he had been a licensed attorney in Tennessee for over twenty-five years at the time of the hearing and had been practicing criminal law during that entire time. Counsel stated that he was capital murder certified by the State of Tennessee and had tried approximately 100 trials, one-third of which were homicide trials. Counsel confirmed that he had retained an investigator to assist in the case but that there was little evidence that she could provide that was beneficial to the defense because the shooting was captured on video.

Given the weight of the evidence, Counsel testified that this case "from a defense perspective" was like "a guilty plea in front of a jury." Counsel did not believe there was

plea offer from the State. He described the trial strategy as "hop[ing] the State might have some witness problems" or appealing to the jury to convict of a lesser-included offense.

Counsel recalled that Petitioner wanted to testify so that he could tell his side of the story. Counsel described Petitioner's testimony as a "double-edged sword" because of the similarity between the felony murder in perpetration of robbery charge and his criminal history of robbery-related offenses. Counsel attempted to dissuade Petitioner but was unsuccessful.

Counsel testified regarding the State's exchange with Mr. Mull. Counsel acknowledged that the State asked Mr. Mull about the contents of his written statement to police. Petitioner inquired why Counsel did not object to the State's reading Mr. Mull's incriminating statements about Petitioner. Counsel explained that he did not object because he thought the statements fell within an exception to the evidentiary rule against hearsay. Counsel stated that he believed that the State was refreshing the witness's memory when the State later passed Mr. Mull a copy of his written statement and had him read from it. Counsel further explained that he did not object to the State's method because he thought "it was an inconsequential matter" and "to a certain extent, it inured to [Petitioner's] benefit because the State was struggling in front of the jury with their witness."

Counsel acknowledged that Petitioner testified that he had consumed cocaine and alcohol prior to the shooting. Counsel did not specifically recall that he had mentioned this fact at trial and had used it in his closing argument but conceded that it "sounds accurate." In explaining his strategy, Counsel testified that he was "grasping at straws" because "there's not much you can say when your client is on video grabbing an unarmed man and then shooting him." Nonetheless, Counsel stated that he believed that he should have requested a jury instruction pertaining to voluntary intoxication "in fairness to everybody."

Petitioner testified on his own behalf at the post-conviction hearing. Petitioner testified that he met with Counsel twice prior to trial. He stated that he wrote several letters to the Board of Professional Responsibility complaining that he did not think Counsel was working in Petitioner's best interest. Petitioner testified that prior to the incident, he had used cocaine, took Xanax, and consumed alcohol. He claimed that he had requested that Counsel subpoena his toxicology report from the hospital where he was treated but that Counsel told him "none of that would matter." He further claimed that the incident with the victim was a "verbal altercation that escalated" into "mutual combat." According to Petitioner, he shot the victim first because the victim was pointing his gun at him. He contended that he "never should have been charged with first-degree murder, because it was never a robbery." Finally, Petitioner claimed that he was intoxicated, and the incident never would have happened had he "been in [his] right mind."

## C. Post-Conviction Court's Findings

The post-conviction court made oral findings, as well as findings of fact and conclusions of law in a written order entered May 31, 2024. Pertinent to this appeal, the post-conviction court noted that Counsel had practiced law in Tennessee since 1997 and was capital murder certified by the State of Tennessee. The court also noted that Counsel had tried over 100 cases with approximately one-third being homicide cases. In light of the evidence, the court opined "[t]here is absolutely nothing that any other lawyer would have done that would have made a difference in this case."

Concerning Petitioner's first claim, the post-conviction court found that in Mr. Mull's testimony he reiterated several times that he either did not remember his written statements made to the police or did not make them altogether. The court reasoned that the State could therefore use Mr. Mull's prior statements to the police to refresh his memory under Tennessee Rule of Evidence 612. Further, given Mr. Mull's equivocation regarding his statements, the State could permissibly seek to impeach him with his written statement under Tennessee Rule of Evidence 613(b). The post-conviction court concluded that there were no legal grounds for Counsel to object to the State's questioning, therefore Counsel was neither deficient nor was Petitioner prejudiced by Counsel's failure to object to the State's method of examination. To the contrary, the court determined "[t]he trial record clearly indicates that [Counsel] vigorously challenged and cross-examined prosecution witnesses" and made a "strategic, trial, tactical decision to challenge [the] credibility of the State's witnesses."

Concerning Petitioner's second claim, the post-conviction court concluded that there was "absolutely no evidence . . . before the jury that would support a charge on intoxication." Specifically, the post-conviction court recognized that under Tennessee law, voluntary intoxication was not a defense to first degree felony murder. As such, the court reflected that "had [Counsel] requested a charge on intoxication," the court would have denied the request. Accordingly, the court determined that Petitioner had failed to meet his burden that Counsel was ineffective.

The post-conviction court concluded that Counsel "effectively and adequately completely represented [Petitioner]" and that there was "absolutely nothing on [the] record that would indicate that [Petitioner] was somehow prejudiced." Determining that all of Petitioner's claims were without merit, the court denied Petitioner's petition for post-conviction relief.

Petitioner's timely appeal follows.

## II. Analysis

### A. Post-Conviction Standard of Review

To obtain post-conviction relief, a petitioner must establish his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A petitioner bears the burden of proving the factual allegations contained in the petition by clear and convincing evidence. *Id.* § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 296 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Appellate courts do not reassess the post-conviction court's determination of the credibility of witnesses. *Dellinger*, 279 S.W.3d at 292 (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, a post-conviction court's factual findings will not be disturbed unless the evidence contained in the record preponderates against the findings. *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988); *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). On the other hand, conclusions of law are given no presumption of correctness on appeal. *Dellinger*, 279 S.W.3d at 293; *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). We review "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (first *citing Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); and then citing *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)).

### B. Ineffective Assistance of Counsel

Petitioner asserts that Counsel was ineffective because Counsel failed to object to the State's methods of questioning Mr. Mull about his prior statement and failed to request a jury instruction on voluntary intoxication. Petitioner asserts that Counsel's deficiencies resulted in cumulative error, depriving him of a fair trial.

Both the United States Constitution and the Constitution of the State of Tennessee guarantee criminal defendants the right to effective assistance of counsel. U.S. Const. amend VI; Tenn. Const. art. I, § 9. Under the Sixth Amendment to the United States Constitution, when a petitioner raises an ineffective assistance of counsel claim, the burden

is on the petitioner to show both (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). To prevail on such a claim, a petitioner must prove both prongs of the *Strickland* test, and failure to prove either is "a sufficient basis to deny relief on the claim." *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "[A] court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

To prove that counsel's performance was deficient, a petitioner must establish that his attorney's conduct fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As our supreme court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 934-35 (Tenn. 1975)). A reviewing "court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation." *Alley v. State*, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). A reviewing court also cannot criticize a sound, but unsuccessful, tactical decision made during the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* As such, a petitioner must establish that his or her attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463).

### 1. Prior Written Statement of Mr. Mull

Petitioner contends that Counsel was deficient for failing to object to the State's methods for refreshing and impeaching Mr. Mull with his written statement. Petitioner claims that had this evidence been objected to and kept out of trial, the outcome of the trial would have been different. The State responds that Counsel made a strategic decision to forgo an objection. Moreover, the State argues there were no legal grounds on which to object. We agree with the State.

Petitioner has failed to show that Counsel was deficient by not objecting to the State's questioning of Mr. Mull with his written statement to police. As the post-conviction court correctly stated, the State could use Mr. Mull's statement to the police to refresh his memory under Tennessee Rule of Evidence 612. When he was confronted with portions of his statement, Mr. Mull answered that that he did not "recall saying that," and "I don't remember." The language of Rule 612 states that a "writing" may be used by a testifying witness "to refresh memory for the purpose of testifying . . ." Tenn. R. Evid. 612. Further, given Mr. Mull's equivocation regarding his testimony that differed from his written statement, the State could permissibly seek to impeach him with the statement under Tennessee Rule of Evidence 613(b). Rule 613(b) allows "[e]xtrinsic evidence of a prior inconsistent statement" to be admitted if a witness is given the opportunity to "explain or deny" the statement. Here, Mr. Mull was given the opportunity to do just that. The post-conviction court correctly concluded that there were no legal grounds for Counsel to object to the State's method of questioning Mr. Mull. Further, Counsel explained that his decision to object to the State's confrontation of Mr. Mull with the statement was a strategic one to Petitioner's "benefit" because "the State was struggling in front of the jury with their witness." As the post-conviction court stated, Counsel "vigorously challenged and cross-examined prosecution witnesses" and made a "strategic, trial, tactical decision to challenge [the] credibility of the State's witnesses" during the trial. We defer to Counsel's tactical decision not to object in this instance and we conclude nothing in the record preponderates against the post-conviction court's finding. *See Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004) (stating that courts generally defer to counsel's strategic and tactical decisions if they are informed decisions based on adequate preparation); *see also Daugherty v. State*, 470 S.W.2d 865, 866 (Tenn. Crim. App. 1971) ("Not only is technical perfection of counsel not necessarily demanded by Constitutional standards, but we also know that the failure to object to evidence is often a matter of trial strategy, not a reflection of oversight or incompetence.").

Second, Petitioner has failed to show that he was prejudiced by Counsel's decision not to object. Assuming, *arguendo*, that Mr. Mull's prior statement were excluded by the trial court, Petitioner has failed to show that the outcome of the trial would have been different. As this court previously summarized the case, "[t]he evidence against

[Petitioner] was overwhelming." *Butler*, 2018 WL 934584, at \*4. Counsel said Petitioner's trial was like "a guilty plea in front of a jury." Petitioner admitted to confronting and shooting the victim and reaching into the cash drawer, and he was video recorded doing so. *Id.* Witnesses, DNA testing, and Petitioner's own testimony all place him at the shooting. *Id.* Hence, Petitioner has failed to show that Counsel's failure to object caused him prejudice. Petitioner is not entitled to relief on this issue.

### 2. Jury Instruction on Voluntary Intoxication

Petitioner next argues that Counsel was ineffective because he failed to request a jury instruction on voluntary intoxication. According to Petitioner, there was "ample evidence of drug use and intoxication" which could negate the culpable mental state required to commit robbery, the underlying felony in Petitioner's first degree felony murder charge. Petitioner argues that "though the [trial court] instructed the jury on lesser[-]included offenses, omitting this instruction on a charge of felony murder left the jury no apparent way to reach any of these verdicts." The State responds that voluntary intoxication was not an available defense for the charged offenses, so Petitioner cannot show ineffective performance by Counsel nor prejudice to Petitioner. We agree with the State.

Under Tennessee law, "intoxication itself is not a defense to prosecution for an offense," although evidence of intoxication may be admissible to negate a culpable mental state if relevant. Tenn. Code Ann. § 39-11-503(a). As charged here, first degree felony murder is the killing of another committed in the perpetration of robbery, a felony. Tenn. Code Ann. § 39-13-202(a)(2). The mental state required for felony murder is the intent to commit the underlying felony. Tenn. Code Ann. § 39-13-202(b). No specific intent is required for the killing itself; the specific intent associated with the felony is legally transferred to the homicide. *State v. Godsey*, 60 S.W.3d 759, 773 (2001). This court previously has recognized that voluntary intoxication is not a defense to felony murder. *State v. Howard*, 693 S.W.2d 365, 368 (Tenn. Crim. App. 1985). However, our supreme court has recognized that evidence of intoxication can be admitted at trial to negate the intent required in committing the felony underlying the felony murder charge. *See Wiley v. State*, 183 S.W.3d 317, 333 (Tenn. 2006) (citing *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999)). "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." *State v. Hatcher*, 310 S.W.3d 788, 814 (Tenn. 2010).

To warrant a jury instruction on voluntary intoxication, there must be evidence that the intoxication was so severe that it deprived the defendant of the mental capacity to form the specific intent required for the crime charged. *Id.* at 815. Proof of intoxication alone is insufficient; the determinative question is the defendant's mental capacity at the time of

the offense. *See id.*; *see also Mills v. State*, No. W2005-00480-CCA-R3PC, 2006 WL 44381, at \*8 (Tenn. Crim. App. Jan. 5, 2006) (concluding evidence supported a request for voluntary intoxication instruction where evidence suggested the petitioner was under the influence of cocaine at the time of the offenses because his eyes were shiny and his ability to focus on what he was doing was impaired), *perm. app. denied* (Tenn. May 1, 2006); *Brooks v. State*, No. M2010-02451-CCA-R3PC, 2012 WL 112554, at \*12 (Tenn. Crim. App. Jan. 11, 2012) (concluding evidence did not support voluntary intoxication instruction where the petitioner stated he had smoked marijuana, "but there was no evidence presented regarding how intoxicated the petitioner was at the time of the [offense]"), *perm. app. denied* (Tenn. May 16, 2012). Should the evidence not fairly raise the question of whether the defendant's intoxication compromised his mental capacity to form specific intent, the court is not required to provide an instruction on voluntary intoxication. *See Howard*, 693 S.W.2d at 368.

Here, Petitioner has failed to show that he was entitled to an instruction on voluntary intoxication; and accordingly, that Counsel was ineffective. Given his charge of first degree felony murder, Petitioner's alleged intoxication could only have served to negate the culpable mental state required for the underlying robbery. *See Wiley*, 183 S.W.3d at 333; *Hathaway v. State*, No. W2009-02428-CCA-R3-PC, 2011 WL 2418118, at \*12 (Tenn. Crim. App. June 13, 2011), *perm. app. denied* (Tenn. Oct.18, 2011). In Tennessee, robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

At trial, the only evidence adduced regarding Petitioner's intoxication was his own self-serving statements. According to Petitioner, he had snorted cocaine, taken Xanax, and drank alcohol throughout the night up until 6:00 or 7:00 a.m. He stated that the Xanax made him "feel groggy and agitated and aggressive." Petitioner further explained that on the morning of the incident he was upset because he had been sold some bad cocaine. Once inside Midway Liquors, Petitioner testified that he was upset about the victim throwing the cigarettes on the counter, which caused Petitioner to demand his money back and ultimately shoot the victim. This evidence is insufficient to show intoxication so severe that it deprived Petitioner of the mental capacity to form the specific intent required for robbery. *See Hatcher*, 310 S.W.3d at 815; *Wiley*, 183 S.W.3d at 333 ("At no point did the petitioner assert that he lacked intent or that he did not recall the events due to his level of impairment. The petitioner also introduced no evidence during post-conviction that would have supported this defense.").

Moreover, as to Petitioner's claim that Counsel was deficient for failing to subpoena his medical records to obtain a toxicology report, we note that no such report was offered by Petitioner at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (stating it is the petitioner's burden to present evidence to support

the issues raised in his post-conviction petition). His failure to do so results in his failure to meet his burden that Counsel was ineffective on this issue. Accordingly, Petitioner is not entitled to relief.

### 3. Cumulative Error

Petitioner's final claim is that Counsel's alleged failures warrant relief under the cumulative error doctrine. This court has recognized that, "in the context of an ineffective assistance of counsel claim, cumulative error examines the prejudicial effect of multiple instances of deficient performance." *Harris v. State*, No. E2022-00446-CCA-R3- PC, 2022 WL 17729352, at *9 (Tenn. Crim. App. Dec. 16, 2022) (citation and internal quotation marks omitted), *perm. app. denied* (Tenn. Apr. 18, 2023). Where a Petitioner "has failed to show that he received constitutionally deficient representation on any single issue[,] [he] may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors." *Conaser v. State*, No. M2023-00271-CCA-R3-PC, 2024 WL 244964, at *7 (Tenn. Crim. App. Jan. 23, 2024) (citation and internal quotation marks omitted), *no perm. app. filed*.

As we have discerned no instances of deficient performance by Counsel, Petitioner necessarily cannot show cumulative error. *See Martin v. State*, No. E2022-00688- CCA-R3-PC, 2023 WL 3361543, at *5 (Tenn. Crim. App. May 11, 2023) ("[C]umulative error does not apply in post-conviction cases where the petitioner has failed to show any instance of deficient performance by counsel."), *perm. app. denied* (Tenn. Sept. 11, 2023). As such, Petitioner is not entitled to relief on this issue.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE